UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MAUREEN LAKE, Derivatively on Behalf of Herself and All Others Similarly Situated,<br><br>                                      Plaintiff,<br><br>        v.<br><br>GEORGE A. SCANGOS, PAUL J. CLANCY, STELIOS PAPADOPOULOS, ALEXANDER DENNER, CAROLINE DORSA, NANCY LEAMING, RICHARD MULLIGAN, ROBERT PANGIA, BRIAN POSNER, ERIC ROWINSKY, LYNN SCHENK, STEPHEN SHERWIN,<br><br>                                      Defendants,<br><br>        -and-<br><br>BIOGEN, INC.,<br><br>                          Nominal Defendant. | Case No.<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**INTRODUCTION**

1.     Plaintiff, by and through her attorneys, brings this action derivatively on behalf of nominal defendant Biogen, Inc. ("Biogen" or the "Company") and alleges upon personal knowledge as to herself and her own acts, and as to all other matters based upon the investigation conducted by her attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, documents, analyst reports, news reports, press releases, and other publicly-available information regarding the Company, as follows:

2.     This is a shareholder derivative action brought on behalf of the Company against the members of its Board of Directors ("Board") and/or certain of its executive officers seeking

to remedy defendants' breaches of fiduciary duties and other violations of the law that occurred from at least January 29, 2015 through July 23, 2015 ("Relevant Period").

3.  Biogen, with its headquarters in Cambridge, Massachusetts, is a global biopharmaceutical company focused on discovering, developing, manufacturing, and delivering therapies for neurological, autoimmune, and hematologic disorders. The Company's principal marketed products include AVONEX, PLEGRIDY, TECFIDERA, TYSABRI, and FAMPYRA for multiple sclerosis ("MS"), ALPROLIX for hemophilia B, and ELOCTATE for hemophilia A. Biogen also collaborates on the development and commercialization of RITUXAN for the treatment of non-Hodgkin's lymphoma, chronic lymphocytic leukemia, and other conditions and shares profits and losses for GAZYVA, which is approved for the treatment of chronic lymphocytic leukemia.

4.  Since January 29, 2015, Biogen and certain of its officers and directors have misrepresented the financial benefits that would inure to the Company from its sales of TECFIDERA ("Tecfidera"). On January 29, 2015, in a press release issued by the Company and in an earnings call with financial analysts, Biogen and certain of its officers represented expected revenue growth between 14% and 16% in 2015 compared to 2014 revenues. As will be discussed in more detail below, the Company's revenue is largely dependent on Tecfidera, and any weakness in sales of Tecfidera will have significant consequences for the Company as a whole.

5.  On July 24, 2015, Biogen issued a press release announcing its financial results for the second quarter of 2015. Among other things, the Company disclosed a revision to its previously issued revenue growth guidance. Biogen reduced its expected revenue growth by about half, now expecting revenue growth of approximately 6% to 8%

compared to 2014. The Company disclosed that this revision was "based largely on revised expectations for the growth of TECFIDERA."

6.      On this news, the price of Biogen common stock declined from a closing share price of $385.05 on July 23, 2015 to close at $300.03 per share on July 24, 2015, a loss of more than 22%, on extremely heavy trading volume.

7.      Throughout the Relevant Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) misrepresented the financial benefits that would inure to the Company from its sales of Tecfidera; (2); the expected revenue growth in 2015 compared to 2014; (3) the Company is largely dependent on Tecfidera and any weakness in sales of Tecfidera will have significant consequences for the company as a whole; and (4) that, as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction pursuant to 28 U.S.C. §1332(a)(2), as plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

9.      This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in, and maintains operations in, this district, or is an individual who has sufficient minimum contacts with this district so as to render the exercise of jurisdiction by the district courts permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this Court under 28 U.S.C. §1391(a) because: (1) one or more defendants either reside in, or maintain executive offices in, this district; (2) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred within this district, and (3) defendants have received substantial compensation in this district by conducting business herein and by engaging in numerous activities that have had an effect in this district.

**PARTIES**

8.     Plaintiff, Maureen Lake is a current shareholder of the Company and has been a shareholder of the Company during the Relevant Period.

9.     Nominal Defendant Biogen, Inc. ("Biogen") is a Delaware corporation with its principal executive offices located at 225 Binney Street, Cambridge, Massachusetts 02142.  Its common stock trades on the NasdaqGS ("NASDAQ") under the symbol, "BIIB."

10.     Defendant George A. Scangos ("Scangos") is Chief Executive Officer and a director of Biogen.  Plaintiff is informed and believes, and thereupon alleges, that Scangos is a citizen of the State of Massachusetts.  Scangos may be served with process at 69 Denny Road, Chestnut Hill, MA 02467-1852, or wherever he may be found.

11.     Defendant Paul J. Clancy ("Clancy") is Executive Vice President, Finance and Chief Financial Officer of Biogen.  Plaintiff is informed and believes, and thereupon alleges, that Clancy is a citizen of the State of Massachusetts.  Clancy may be served with process at 3 Chongris Circle, Andover, MA 01810-1254, or wherever he may be found.

12.     Defendant Stelios Papadopoulos, Ph.D. ("Papadopoulos"), is, and at all relevant times was, a director of the Company.  Plaintiff is informed and believes, and thereupon alleges, that Papadopoulos is a citizen of the State of California.  Papadopoulos may be served with

process at 15528 Churchill Downs Drive, Rancho Santa Fe, CA 92067, or wherever he may be found.

13.     Defendant Alexander Denner, Ph.D. ("Denner"), is, and at all relevant times was, a director of the Company.  Plaintiff is informed and believes, and thereupon alleges, that Denner is a citizen of the State of Connecticut.  Denner may be served with process at 565 Stanwich Road, Greenwich, CT 06831-3111, or wherever he may be found.

14.     Defendant Caroline Dorsa ("Dorsa"), is, and at all relevant times was, a director of the Company.  Plaintiff is informed and believes, and thereupon alleges, that Dorsa is a citizen of the State of Pennsylvania.  Dorsa may be served with process at 2966 Comfort Road, New Hope, PA 18938-5620, or wherever she may be found.

15.     Defendant Nancy Leaming ("Leaming"), is, and at all relevant times was, a director of the Company.  Plaintiff is informed and believes, and thereupon alleges, that Leaming is a citizen of the State of Massachusetts.  Leaming may be served with process at 30 Pier 7, Charlestown, MA 02129-4226, or wherever she may be found.

16.     Defendant Richard Mulligan, Ph.D. ("Mulligan"), is, and at all relevant times was, a director of the Company.  Plaintiff is informed and believes, and thereupon alleges, that Mulligan is a citizen of the State of Massachusetts.  Mulligan may be served with process at 225 Binney Street, Cambridge, Massachusetts 02142, or wherever he may be found.

17.     Defendant Robert Pangia ("Pangia"), is, and at all relevant times was, a director of the Company.  Plaintiff is informed and believes, and thereupon alleges, that Pangia is a citizen of the State of New York.  Pangia may be served with process at 500 Greenwich Street, Room 601, New York, NY 10013-0512, or wherever he may be found.

18.     Defendant Brian Posner ("Posner"), is, and at all relevant times was, a director of the Company.  Plaintiff is informed and believes, and thereupon alleges, that Posner is a citizen of the State of Connecticut.  Posner may be served with process at 238 Marshall Ridge Road, New Canaan, CT 06840-6139, or wherever he may be found.

19.     Defendant Eric Rowinsky ("Rowinsky"), is, and at all relevant times was, a director of the Company.  Plaintiff is informed and believes, and thereupon alleges, that Rowinsky is a citizen of the State of New York.  Rowinsky may be served with process at 215 E. 73rd Street, New York, NY 10021-3653, or wherever he may be found.

20.     Defendant Lynn Schenk ("Schenk"), is, and at all relevant times was, a director of the Company.  Plaintiff is informed and believes, and thereupon alleges, that Schenk is a citizen of the State of California.  Schenk may be served with process at 101 W. Broadway, San Diego, CA 92101-8201, or wherever she may be found.

21.     Defendant Stephen Sherwin, M.D. ("Sherwin"), is, and at all relevant times was, a director of the Company.  Plaintiff is informed and believes, and thereupon alleges, that Sherwin is a citizen of the State of California.  Sherwin may be served with process at 3508 Clay Street, San Francisco, CA 94118-1839, or wherever he may be found.

22.     The Defendants identified in ¶¶10-21, above, are sometimes collectively referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

23.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control

and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.

24.     Each director and officer owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information concerning the Company's revenue, margins, operations, performance, management, projections, and forecasts, so that the market price of the Company's stock would be based on truthful and accurate information.

25.     The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their executive, managerial, and/or directorial positions within the Company, each of the Individual Defendants had access to adverse, non-public information about the Company's financial condition and operations, and the misrepresentations made relevant thereto.

26.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company, and was at all times acting within the course and scope of such agency.

27.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the

financial affairs of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

a.      manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

b.      neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

c.      establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d.      neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

e.      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f.      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g.      properly and accurately guide investors and analysts regarding the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

h.    remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

28.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.  The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining defendants.

29.    The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its financial results and prospects, as detailed herein, and by failing to prevent employees and/or officers of the Company from taking such illegal actions.  In addition, the Company is now the subject of class action litigation alleging violation of federal securities laws, which necessitates the Company to incur excess costs arising from the Individual Defendants' wrongful course of conduct.

30.    Additionally, the Company has established a Code of Business Conduct ("Business Code") that applies to all employees of the Company.  The conduct of the Individual

Defendants alleged herein constitutes a violation of the Company's Business Code.   The

Business Code provides, among other things, the following:

> Our Code of Business Conduct provides guidance to help you make the right
> ethical decisions while conducting business on behalf of Biogen Idec. The
> challenges of meeting our ethics and compliance responsibilities in today's
> complex business environment are not static; that is why key aspects of our
> compliance program must be periodically reviewed to ensure that they remain
> relevant and effective. This Code is the result of our efforts to update our ethics
> and compliance initiatives by reviewing current best practices, new challenges,
> and feedback from employees and others. We are pleased to announce that this
> Code contains several important improvements, which we believe make it a better
> resource for you.

> This Code provides the ethical guidelines and expectations for conducting
> business on behalf of the Company.

> This Code applies to all employees, officers and directors. Certain business
> partners, such as joint ventures, agents, consultants, distributors, suppliers,
> vendors, independent contractors, and temporary employees are also expected to
> live up to the principles of the Code. Managers who supervise our external
> business partners are responsible for ensuring that they understand our standards.

> At Biogen Idec, we understand and accept our responsibilities to respect and care
> for our patients and customers, to always act in accordance with our Core Values
> and to comply with all applicable laws and regulations. Each of us must accept
> this commitment for ours is a shared responsibility.

> Doing the right thing in today's business environment is not always easy.
> Healthcare laws and regulations change, and situations involving ethics can be
> complicated. While our commitment and our responsibilities are clear, sometimes
> it is difficult to know what to do in certain situations. That is why we periodically
> revise our Code of Business Conduct and provide you with the resources to help
> you understand our standards and expectations, to help you exercise sound
> judgement and make good choices for the Company, for our patients and
> customers, and for yourself.

> We live and work in a global society and face a number of laws and regulations
> governing our industry's operations. These laws and regulations have a direct
> impact on our daily work. They also govern our interactions with our many
> business partners and associates such as researchers, patients, healthcare
> professionals and governments.

**Conflicts of Interest**

A conflict of interest occurs when you have a competing interest that may interfere with your ability to make an objective decision.  Each of us is expected to use good judgment and avoid situations that can lead to even the appearance of a conflict.

Conflicts of interest may be actual or just a matter of perception. Since these situations are not always clear-cut, you need to fully disclose them to your manager, Human Resources, Legal or Corporate Compliance so that we can properly manage them.

**Disclosure of Material Information**

Our Company is subject to extensive and complex reporting requirements. Our operations must comply with all applicable regulatory, accounting, financial and other rules and regulations of the jurisdictions in which we operate.

Business partners, government officials, investors and the public rely on the accuracy and completeness of our financial reports, business records and what we tell them. All of our financial records and accounts, and financial statements must be clear and complete, maintained in reasonable detail, and appropriately reflect our Company's transactions and activities. This includes our financial records and operational data such as cost and production data, expense reports and employee records. Accurate and complete information is also essential to us as a basis for sound decision-making.

The Company's filings with the Securities and Exchange Commission, as well as other public disclosures by or on behalf of our Company, must be fair, complete, accurate, timely, and understandable. Our accounting and financial reporting practices must also comply with applicable generally accepted accounting principles and other criteria, such as local statutory reporting and tax requirements. Depending on their position with the Company, employees may be called upon to provide necessary information to assure that the Company's filings and public communications meet these standards. The Company expects employees to take this responsibility seriously and to promptly provide current, accurate and complete answers to inquiries related to the Company's public disclosure requirements.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

31.     In committing the wrongful acts alleged herein, the Individual Defendants have

pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with,

and conspired with, one another in furtherance of their common plan or design.  In addition to

the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants

further aided and abetted and/or assisted each other in breach of their respective duties.

32.    During all times relevant hereto, the Individual Defendants collectively and

individually initiated a course of conduct that was designed to and did:

(a)    Conceal the fact that the Company was improperly misrepresenting its
financial results in order to allow defendants to artificially inflate the price of the
Company's shares;

(b)    Maintain the Individual Defendants' executive and directorial positions at
the Company and the profits, power, and prestige that the Individual Defendants
enjoyed as a result of these positions; and

(c)    Deceive the investing public, including shareholders of the Company,
regarding the Individual Defendants' management of the Company's operations,
the Company's financial health and stability, and future business prospects,
specifically related to the Company's financial condition that had been
misrepresented by the Individual Defendants throughout the Relevant Period.

33.    In furtherance of this plan, conspiracy, and course of conduct, the Individual

Defendants collectively and individually took the actions set forth herein.

34.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or

common course of conduct during the Relevant Period.   During this time, the Individual

Defendants caused the Company to conceal material facts, misrepresent its financial results, and

violate applicable laws.   In addition, the Individual Defendants also made other specific, false

statements about the Company's financial performance and future business prospects, as alleged

herein.

35.    The purpose and effect of the Individual Defendants' conspiracy, common

enterprise, and/or common course of conduct was, among other things: (1) to disguise the

Individual Defendants' breaches of fiduciary duty, abuse of control, gross mismanagement,

waste of corporate assets, and unjust enrichment; (2) to conceal adverse information concerning

the Company's operations, financial condition, and future business prospects; and (3) to artificially inflate the price of the Company's stock, or to sustain a price that was artificially inflated, so that the Individual Defendants could protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

36. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise, and/or common course of conduct alleged herein.

37. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs alleged herein. In taking such actions to substantially assist the commission of the wrongdoing alleged herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to, and furtherance of, the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### Background

38. Biogen is a global biopharmaceutical company focused on discovering, developing, manufacturing, and delivering therapies for neurological, autoimmune, and hematologic disorders. The Company's principal marketed products include AVONEX, PLEGRIDY, TECFIDERA, TYSABRI, and FAMPYRA for multiple sclerosis ("MS"), ALPROLIX for hemophilia B, and ELOCTATE for hemophilia A. Biogen also collaborates

on the development and commercialization of RITUXAN for the treatment of non-Hodgkin's lymphoma, chronic lymphocytic leukemia, and other conditions and shares profits and losses for GAZYVA, which is approved for the treatment of chronic lymphocytic leukemia.

39.     Tecfidera is one of Biogen's most important drug products. In the Company's Annual Report on Form 10-K filed with the SEC on February 4, 2015 (the "10-K"), Biogen stated, "Our current revenues depend upon continued sales of our principal products, TECFIDERA . . .."

40.     On it's website, Biogen touts that "TECFIDERA is a pill approved by the FDA to treat relapsing multiple sclerosis (MS)."[1] Relapsing MS is a progressive disease that causes damage to the central nervous system, manifested in outward and silent symptoms. Relapsing MS is thought to be an autoimmune disease, which means that, instead of defending the body against harmful invaders (such as viruses or bacteria), the immune system attacks the body itself.

41.     Tecfidera treats relapsing MS by slowing the development of brain lesions and the progression of physical disability.

**The Material Misrepresentations and Omissions**

42.     On January 29, 2015, the beginning of the Relevant Period, Biogen issued a press release announcing its full year and fourth quarter 2014 financial results. In the press release, the Company also provided important information related to its financial outlook for 2015. In relevant part, the press release stated:

2015 Financial Guidance

Biogen Idec also announced its full year 2015 financial guidance. This guidance consists of the following components:

- ***Revenue growth is expected to be approximately 14% to***

*16% compared to 2014.*

- R&D expense is expected to be approximately 19% to 20% of total revenue.
- SG&A expense is expected to be approximately 20% to 21% of total revenue.
- GAAP diluted EPS is expected to be between $15.45 and $15.85.
- Non-GAAP diluted EPS is expected to be between $16.60 and $17.00.

Biogen Idec may incur charges, realize gains or experience other events in 2015 that could cause actual results to vary from this guidance.

In 2015, the Company plans to provide annual financial guidance and one update per year, which is expected to be provided in connection with its second quarter earnings release. This modest change is intended to synchronize guidance with internal business planning processes and to ensure a continued focus on long-term value creation.

(Emphasis added.)

43.     Additionally, in a conference call with financial analysts on January 29, 2015, Defendant Clancy reiterated the Company's revenue growth expectations, stating, "Let me turn to our full year 2015 guidance. . . . [W]e expect revenue growth between 14% and 16%."

44.     Another conference call with financial analysts was held on April 24, 2015, wherein Defendant Clancy discussed the particular importance of Tecfidera to the Company's revenue outlook:

There are two key items that we're keeping a watchful eye on for the rest of the year. First, while foreign exchange has been a headwind, any additional strengthening of the dollar could exacerbate this impact on revenue. And second, *we continue to expect TECFIDERA will represent the largest contributor to our overall revenue growth. If the U.S. trajectory does not improve, we may come in at the lower end of our previously provided revenue growth*.

(Emphasis added.) Accordingly, Defendant Clancy not only reaffirmed the Company's previously issued 2015 revenue growth guidance, a range of 14% to 16% over 2014, he stated that without improvement in Tecfidera's performance, the Company would generate revenue

growth "at the lower end of [Biogen's] previously provided revenue growth."

**The Truth Emerges**

45.     On July 24, 2015, the Company issued a press release announcing its financial results for the second quarter of 2015. In addition to disclosing information about Biogen's previous financial performance, the press release disclosed revised 2015 financial guidance. The press release stated in pertinent part:

**2015 Financial Guidance**

As previously announced, the Company plans to provide annual financial guidance and one update per year. Biogen's mid-year update to its full year 2015 financial guidance consists of the following components:

- ***Revenue growth is expected to be approximately 6% to 8% compared to 2014, a decrease from prior guidance based largely on revised expectations for the growth of TECFIDERA.***
- R&D expense is expected to be approximately 19% to 20% of total revenue, unchanged from prior guidance.
- SG&A expense is expected to be approximately 20% to 21% of total revenue, unchanged from prior guidance.
- GAAP diluted EPS is expected to be between $14.25 and $14.70, a decrease from prior guidance.
- Non-GAAP diluted EPS is expected to be between $15.50 and $15.95, a decrease from prior guidance.

(Emphasis added.) Accordingly, Biogen reduced its revenue growth guidance by more than half "based largely on revised expectations for the growth of TECFIDERA."

46.      On the same day, the Company filed its quarterly report on Form 10-Q with the SEC (the "10-Q"). The 10-Q disclosed that the Company generated $2.199 billion in revenue in the second quarter of 2015 compared to $2.056 billion in the same quarter of 2014. Accordingly, the Company's revenue grew by only 6.9% in the second quarter of 2015 over the second quarter of 2014.

47.      The statements contained in  ¶¶ 33-41, were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) misrepresented

the financial benefits that would inure to the Company from its sales of Tecfidera; (2); the expected revenue growth in 2015 compared to 2014; (3) the Company is largely dependent on Tecfidera and any weakness in sales of Tecfidera will have significant consequences for the company as a whole; and  (4) that, as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.  Defendants breached their fiduciary duties to the Company and to Biogen's shareholders in allowing the material misstatements to be issued and by failing to disclose material information.

48.     As a result of revision to Biogen's 2015 revenue growth outlook, the price of Biogen common stock declined from a closing share price of $385.05 on July 23, 2015 to close at $300.03 per share on July 24, 2015, a loss of more than 22%, on extremely heavy trading volume.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

49.     Plaintiff brings this action derivatively in the right, and for the benefit, of the Company to redress injuries suffered, and to be suffered, by the Company as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  The Company is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction in this Court that it would not otherwise have.

50.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

51.     Plaintiff is the owner of the Company's common stock and was the owner of the Company's common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

52.     At the time that this action was commenced, the Company's Board consisted of the following directors: Defendants Papadopoulos, Denner, Dorsa, Leaming, Mulligan, Pangia, Posner, Rowinsky, Schenk, and Sherwin.

53.     As a result of the facts set forth herein, plaintiff has not made any demand on the Company's Board to institute this action against the Individual Defendants.  Such demand would be a futile and useless act with respect to each and every one of the Individual Defendants because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

a.     Defendants face a substantial likelihood of being held liable for breaching their fiduciary duties of loyalty and good faith as alleged herein, and are therefore incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

b.     Defendants Scangos, Papadopoulos, Denner, Mulligan, and Pangia lack both the independence and disinterestedness required to impartially consider a demand by Plaintiff because they are directly tied to each other having served on other Boards together.

i.     Exelixis, Inc. was co-founded by Papadopoulos in 1994 and he is the chairman of the Board of Directors.  Scangos served as the President and Chief Executive Officer from 1996 through July 2010 and continues to serve on the board.

ii.     Anadys Pharmaceuticals, Inc. was co-founded by Papadopoulos in 2000 and he was a member of the board until it's acquisition by Hoffman-La Rochie in 2011, serving as Chairman of the board during 2011.  Scangos

served as a non-executive Chairman of Anadys from 2005 to July 2010 and was a director of the company from 2003 to July 2010.

iii. Mulligan and Denner are founding partners of Sarissa Capital Management LP, which was formed in 2012. Denner also serves as the Chief Investment Officer of Sarissa.

iv. From 1987 to 1996, Pangia held various senior management positions at PaineWebber, including Executive Vice President and Director of Investment Banking for PaineWebber Incorporated of New York, member of the Board of Directors of PaineWebber, Inc., Chairman of PaineWebber Properties, Inc., and member of several of PaineWebber's executive and operating committees. Papadopoulos joined PaineWebber in 1987 and spent 13 years as an investment banker there.

Therefore, Scangos, Papadopoulos, Denner, Mulligan and Pangia would not be able to vigorously prosecute any such action and cannot, in good faith, exercise independent business judgment to determine whether to bring this action against themselves;

c. Defendant Scangos serves as the CEO, and derives his principal income from his employment at the Company. Defendant Scangos received $18,631,369.00 in total salary and incentive compensation from the Company in 2014.

d. Biogen's non-employee directors have received, and continue to receive, substantial compensation in the form of cash and stock option awards. These defendants are also interested in maintaining their positions on the Board so as to safeguard their substantial compensation and stock options. Defendants lacks both the independence and disinterestedness required to impartially consider a demand by Plaintiff because they all hold substantial financial

interest in Biogen and therefore would not be able to vigorously prosecute any such action and cannot, in good faith, exercise independent business judgment to determine whether to bring this action against themselves.  Noted below are the terms of the substantial compensation that these directors have received, which demonstrates that demand upon such individuals would be futile:

**Compensation of Non-Employee Directors
for Fiscal 2014**

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($)(1) | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($)(2) | Total ($) |
|---|---|---|---|---|
| Alexander J. Denner | $114,625 | $269,509 | | $384,134 |
| Caroline D. Dorsa | $121,500 | $269,509 | | $391,009 |
| Nancy L. Leaming | $124,875 | $269,509 | | $394,384 |
| Richard C. Mulligan | $100,625 | $269,509 | | $370,134 |
| Robert W. Pangia | $122,000 | $269,509 | $31,226 | $422,735 |
| Stelios Papadopoulos | $143,000 | $404,263 | | $547,263 |
| Brian S. Posner | $119,625 | $269,509 | | $389,134 |
| Eric K. Rowinsky | $106,000 | $269,509 | | $375,509 |
| Lynn Schenk | $135,500 | $269,509 | | $405,009 |
| Stephen A. Sherwin | $100,875 | $269,509 | | $380,384 |

*Notes to the 2014 Director Compensation Table*

(1) Reflects the grant date fair value of 2014 annual time-vested RSU grants to non-employee directors, as described in the narrative preceding this table. These RSUs are scheduled to vest in full and be settled in shares on the first anniversary of the grant date, generally subject to continued service. Grant date fair values were computed in accordance with ASC Topic 718 and determined by multiplying the number of RSUs granted by the fair market value of the Company's common stock on the relevant grant date.

(2) The amounts in column (d) represent earnings in the Voluntary Board of Directors Savings Plan that are in excess of 120% of the average applicable federal long-term rate. The federal long-term rate for 2014 applied in this calculation is 4.11%, the federal long-term rate effective in January 2014 when the Fixed Rate Option (FRO) was established for 2014. Only Mr. Pangia has deferred compensation allocated to the FRO.

e.      The entire Board and senior management participated in the wrongs complained of herein.  For the reasons described herein, the Company's directors are not disinterested or independent.  Pursuant to their specific duties as Board members, each was charged with the management of the Company and the conduct of its business affairs.  Each of the above referenced defendants breached the fiduciary duties they owed to the Company and its shareholders in that they failed to prevent and correct the dissemination of the Company's false and misleading statements.  Thus, the Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome since their actions have subjected the Company to millions of dollars in potential liability for violations of applicable securities laws;

21

f.      Defendant Scangos certified many of the Company's SEC filings. Accordingly, demand is futile because of the substantial likelihood of liability for breach of fiduciary duties owed to the Company through the certification of the Company's SEC filings;

g.      Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein thereby rendering demand futile;

h.      The Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

i.      In order to bring this suit, all of the Company's directors would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

j.      The acts complained of constitute violations of the fiduciary duties owed by the Company's officers and directors and these acts are incapable of ratification;

k.      Each of the Individual Defendants authorized and/or permitted the false statements disseminated directly to the public and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if they instituted it;

l.      Any suit by the Company's current directors to remedy these wrongs would likely expose the Individual Defendants and the Company to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual

Defendants; thus, the Individual Defendants are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

m.      The Company has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for the Company any part of the damages that the Company suffered and will suffer thereby; and

p.      If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in a class action complaint for violations of securities law, which admissions would impair their defense of the class action and greatly increase the probability of their personal liability in the class action, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants.  Thus, the Individual Defendants would be forced to take positions contrary to the defenses they will likely assert in the securities class action.

54.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for the Company for any of the wrongdoing alleged by plaintiff herein.

55.    Plaintiff, moreover, has not made any demand on shareholders of the Company to institute this action since demand would be a futile and useless act for the following reasons:

a.      The Company is a publicly held, with over 235 million shares outstanding and thousands of shareholders;

    b.       Making demand on such a number of shareholders would be impossible for plaintiff who has no way of determining the names, addresses, or phone numbers of shareholders; and

    c.       Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

56.    Furthermore, the conduct alleged herein could not have been the product of good faith business judgment, and each of the Individual Defendants faces a substantial likelihood of liability for breaching their fiduciary duties because, through their intentional misconduct, they have subjected the Company to substantial damages.  Furthermore, the conduct of the Individual Defendants has subjected the Company to potential liability in connection with a securities fraud class actions entitled *Tehrani v. Biogen, Inc*., et al., Case No. 1:15-cv-13189-FDS, currently pending in the United States District Court for the District of Massachusetts.  Through their intentional misconduct, the Individual Defendants have subjected the Company to potential costs, fines, and judgments associated with the securities class action.  Such actions by the Individual Defendants cannot be protected by the business judgment rule.  Accordingly, making a pre-suit demand on the Individual Defendants would be futile.

**COUNT I**
**(AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY**
**FOR DISSEMINATING FALSE AND MISLEADING INFORMATION)**

57.    Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

58.    The Individual Defendants owed a fiduciary duty to the Company to supervise the issuance of the Company's press releases and public filings to ensure that they were truthful and accurate and that such filings conformed to applicable securities laws.  The Individual

Defendants, however, breached their fiduciary duties by allowing the Company to issue and disseminate filings that were materially misleading and failing to disclose material information.

59.     As members of the Board, the Individual Defendants were directly responsible for authorizing, permitting the authorization of, or failing to monitor the practices that resulted in violations of applicable laws as alleged herein.   Each of the Individual Defendants had knowledge of, actively participated in, approved, and/or acquiesced in the wrongdoing alleged herein or abdicated his or her responsibilities with respect to this wrongdoing.  The alleged acts of wrongdoing have subjected the Company to unreasonable risks of losses and expenses.

60.     Each of the Individual Defendants' acts in causing or permitting the Company to disseminate material misrepresentations and omissions to the investing have subjected the Company to liability for violations of applicable laws, and therefore were not the product of a valid exercise of business judgment, constituting a complete abdication of their duties as officers and/or directors of the Company.   As a result of the Individual Defendants' breaches, the Company's reputation in the business community and financial markets has been irreparably tarnished.

## COUNT II
### (AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR FAILING TO MAINTAIN ADEQUATE INTERNAL CONTROLS)

61.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

62.     As alleged herein, the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP").   When placed upon notice of problems with the Company's business practices and operations – and actual or

potential violations of GAAP – the Individual Defendants had an obligation to act in good faith to take appropriate action to correct the misconduct alleged and to prevent its recurrence.

63.     The Individual Defendants willfully ignored the obvious and pervasive problems with the Company's internal controls and actual or potential violations of GAAP alleged herein. Moreover, the Individual Defendants failed to make a good faith effort to correct these problems or to prevent their recurrence.  As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

**COUNT III**
**(AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY)**

64.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

65.     The Individual Defendants owed the Company fiduciary obligations.  By reason of such fiduciary obligations, the Individual Defendants specifically owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care, reasonable inquiry, oversight, and supervision.

66.      The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision by engaging in a sustained and systematic failure to exercise their oversight responsibilities and to ensure that the Company complied with applicable laws, rules, and regulations.  As a direct and proximate result of the Individual Defendants' failure to adequately perform their fiduciary obligations, the Company has sustained significant damages monetarily and injury to its corporate image and goodwill.

67.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.  Plaintiff, moreover, has no adequate remedy at law.

## COUNT IV
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR GROSS MISMANGEMENT)

68.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

69.     The Individual Defendants had a duty to the Company and its shareholders to prudently supervise, manage, and control the operations, business, and internal financial accounting and disclosures of the Company.  The Individual Defendants, however, by their actions, and by engaging in the wrongdoing alleged herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of the Company in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, the Individual Defendants breached their duties of due care, diligence, and candor in the management and administration of the Company's affairs and in the use and preservation of the Company's assets.

70.     During the course of the discharge of their duties, the Individual Defendants were aware of the unreasonable risks and losses associated with their misconduct.  Nevertheless, the Individual Defendants caused the Company to engage in the scheme described herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties to the Company.  As a result, the Individual Defendants grossly mismanaged the Company, thereby causing damage to the Company.

## COUNT V
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR CONTRIBUTION AND INDEMIFICATION)

71.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

72.     The Company is alleged to be liable to various persons, entities and/or classes by virtue of the facts alleged herein that give rise to defendants' liability to the Company.

73.     The Company's alleged liability on account of the wrongful acts, practices, and related misconduct alleged arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Individual Defendants, and the Company is entitled to contribution and indemnification from each Individual Defendant in connection with all such claims that have been, are, or may in the future be asserted against the Company by virtue of the Individual Defendants' misconduct.

## COUNT VI
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR ABUSE OF CONTROL)

74.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

75.     The Individual Defendants' conduct, as alleged herein, constituted an abuse of their control over the Company.

76.     As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable.  Plaintiff, moreover, has no adequate remedy at law.

## COUNT VII
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR
## WASTE OF CORPORATE ASSETS)

77.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

78.     The Individual Defendants' conduct, as alleged herein, constituted a waste of the corporate assets of the Company.

79.     As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable.  Plaintiff, moreover, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

i.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

ii.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

iii.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: October 6, 2015              Plaintiff Maureen Lake,

By her attorneys,

/s/Theodore M. Hess-Mahan
Theodore M. Hess-Mahan, BBO #557109
HUTCHINGS, BARSAMIAN,
MANDELCORN & ROBINSON, LLP
110 Cedar Street, Suite 250
Wellesley Hills, MA 02481
(781) 431-2231
thess-mahan@hutchingsbarsamian.com

**THE BRISCOE LAW FIRM, PLLC**
Willie C. Briscoe
Campbell Centre II
8150 N. Central Expressway, Ste. 1575
Dallas, Texas 75206
Telephone:  (214) 239-4568
Facsimile: (281) 254-7789
wbriscoe@thebriscoelawfirm.com

**POWERS TAYLOR LLP**
Patrick Powers
Meredith Black-Mathews
Campbell Centre II
8150 N. Central Expressway, Ste. 1575
Dallas, Texas 75206
Telephone:  214.239.8900 |
Facsimile: 214.239.8901
Patrick@powerstaylor.com
Meredith@powerstaylor.com

Cullin O'Brien
CULLIN O'BRIEN LAW, P.A.
6541 NE 21st Way
Ft. Lauderdale, Florida 33308
cullin@cullinobrienlaw.com
(561) 676-6370
(561) 320-0285 (fax)
cullin@cullinobrienlaw.com

*Attorneys for Plaintiff Maureen Lake*